Maximilian L. Seidman et al., Trading as Seidman & Seidman, Appellants, v. Chicago Eye Shield Company and Robert Malcom, Appellees.

Gen. No. 35,490.

78

Opinion filed June 15, 1932.

BROWN, FOX & BLUMBERG, for appellants; JACOB LOGAN FOX and CHARLES E. LEWIS, of counsel.

McCULLOCH & McCULLOCH, for appellees; GROVER C. McLAREN and LEWIS C. MURTAUGH, of counsel.

MR. JUSTICE FRIEND delivered the opinion of the court.

In September, 1923, there were pending before the government tax department, two cases for additional assessments of income taxes, one against defendant, Robert Malcom, and one against Chicago Eye Shield Company, with respect to income taxes for the years 1917 to 1921 inclusive. Plaintiffs, an accounting firm possessing considerable experience in income tax matters, who were evidently informed as to the pendency of these matters against defendants, proposed to handle the cases on a *per. diem* and expense basis. Defendants refused this proposition, and after several tele-

phonic conferences, a second proposal as outlined in the following letter, dated September 29, 1923, was accepted by plaintiffs:

"Gentlemen:

Our fee for the services outlined in our letter of September 25, 1923, relating to the defense of additional Federal tax assessments against yourself and Chicago Eye Shield Company for the years 1917 to 1921, inclusive, will be $2500.00. This fee will include our traveling and incidental expenses.

(signed) Seidman & Seidman,
by Maxwell Wexler,
C. P. A. Manager."

On October 5, 1923, several days after plaintiffs had been thus employed, the commissioner of internal revenue notified defendants of a further assessment against each defendant, as a penalty imposed on account of alleged fraud in the filing of their tax returns. Notices of these further assessments, prepared by the treasury department, were delivered to Malcom, who communicated the information to Wexler, plaintiffs' representative. Wexler, according to his testimony, thereupon discussed the contents of these notices with Malcom and called his attention to the fact that the agreement of September 29, 1923, did not cover additional services required for the defense of fraud assessments; that Malcom then inquired of Wexler as to the additional charge for handling these matters and Wexler advised that he was unable to state what the charge would be without an examination of the books and records of defendants, whereupon Malcom requested Wexler to proceed with the work, and that he, Malcom, would meanwhile procure records for his examination; that on December 21, 1923, Malcom again discussed with Wexler the question of plaintiffs' fees and charges for the additional representation, and after considerable discussion, an oral agreement was

reached between plaintiffs and defendants, which is described by Wexler's testimony as follows:

"On December 21, 1923, I had a conversation in my office with Mr. Malcom, myself and Malcom being present.

"Q. And what was said by you and what was said by Mr. Malcom? A. I said I had examined the records and had developed some of the information, and that by reason of the injection of the fraud situation, the amount of work would be tremendously increased; but it would require a separate and distinct conference in Washington before the solicitor of internal revenue, in addition to this, that we would have to appear before the income tax unit; that the element of tax assessment and that of fraud was so intermingled that it would be difficult to make any kind of a separation between the two. The work would involve concurrent action.

"Q. What did he say to that? A. Mr. Malcom asked what it would cost to handle the engagement.

"Q. That is, both cases? A. Yes, what it would cost to enter into a new arrangement, and I said it would be difficult, I cannot name him a lump sum because we cannot foresee what we may be up against, and suggested the better plan would be to put this on a time and accomplishment and expense, on that kind of a basis rather than a lump sum or other fee arrangement.

"Q. What did he say? A. He said he was quite well pleased with all the work we had done up to that time and that we should proceed on that basis, and I said all right, we would go along on that basis."

In the latter part of December, 1923, Malcom and Wexler had a further conversation wherein, according to Wexler, Malcom expressed himself as well pleased with plaintiffs' services and stated that he desired to pay something on account of fees. Wexler advised

him that plaintiffs' time records would not be posted until after January 1, and thereupon Malcom told Wexler to send him a bill for $2,500, which was accordingly done. Upon receipt of same, defendants mailed plaintiffs a check for $1,750.

Thereafter on May 25, 1925, which was many months after plaintiffs had completed the major portion of their work, the United States tax officials advised defendants of their final decision to reduce defendants' aggregate taxes to $73,350, which included the overtax, but not the additional tax levied on account of alleged fraud. Defendants thereupon on June 2, 1925, mailed to plaintiffs a check for $750, together with a letter containing the following language: "We are enclosing herewith our check in the amount of $750.00, which balances our account as per our contract with you."

Wexler testified that following the receipt of this letter and check, he had a conference with Malcom on June 9, in which he said: "What is the meaning of this check for $750.00?" to which Malcom replied, "That is in payment of what I owe you, according to our contract." That Wexler thereupon further said, "Surely, you haven't forgotten what our arrangement was" to which Malcom replied, "Well, that is according to the letter you wrote in September." After an exchange of other remarks between these parties, Malcom is said to have stated to Wexler, "Wait, let us see what the Government will do. Then I will take care of you." Having heard nothing further from Malcom, Wexler on June 15, 1925, wrote defendants a. letter, excerpts from which are as follows:

"This will acknowledge receipt of your letter of June 2nd, 1925, together with check enclosed in the amount of $750.00, which you claim to balance our account as per contract. . . . Our fee for the total services to date is $7500.00. Unless we hear from you by

June 18, 1925, by way of a full settlement of our claim, we will apply your check for $750.00 against your account, and take further action for the recovery of the balance.''

Despite the statement in Wexler's letter that he would apply defendants' check for $750 against their account, this check was never cashed, and at the time of the trial still remained in plaintiffs' possession and was produced upon the hearing. Plaintiff contends that in his conversation with Malcom on June 9, 1925, Wexler offered to return the check for $750 to Malcom, but that the latter refused to accept the same. As applicable to this contention, we find that the following occurred on cross-examination of Wexler:

"Mr. McLaren: Q. (continuing) You never sent that check back to Malcom or the Chicago Eye Shield Company? A. He told me he was not going to accept it.

Q. Did you ever send it back to him? A. No sir.

Q. You kept it? A. Yes, sir.

Q. You never offered to give it back to him? A. No.''

There is nothing of record to show why Wexler could not have returned defendants' check by mail, if he had so desired. In any event, the check was never returned, nor was it deposited by plaintiffs to apply against defendants' account.

At the close of plaintiffs' case, the court peremptorily instructed the jury to return a verdict in favor of defendants and entered judgment accordingly. The grounds assigned for reversal are twofold: (1) Plaintiffs' evidence establishes every element of affirmative proof necessary for recovery under the declaration upon the issues of the terms of the agreement of employment, complete performance of the agreement by plaintiffs, breach by defendants and damages sustained; and (2) the court erroneously held the conduct of the parties to be an accord and satisfaction as a matter of law.

If the second question were not in the case, we should concur in plaintiffs' first proposition and hold that there was sufficient evidence of a modified agreement between the parties, the performance thereof by plaintiffs and resultant damages, for submission of the facts to the jury. However, we are inclined to hold with defendants upon the second proposition, namely, that the circumstances and conduct of the parties established an accord and satisfaction as a matter of law, which justified the court in directing a verdict for defendants.

The authorities in this State are numerous and uniform that a payment of a part of a fixed and certain demand which is due and not in dispute is no satisfaction of the whole debt, even where the creditor agrees to receive a part for the whole and gives a receipt for the whole demand. *Ostrander v. Scott,* 161 Ill. 339, and cases cited therein. This doctrine rests upon the ground that the agreement for a discharge of the entire debt is without consideration, but it is limited to cases where the debt is of the character stated, and has no application to the honest settlement of unliquidated or disputed demands. It appears sufficiently from the record in this proceeding that the controversy between these parties was one fairly in dispute and that plaintiffs' claim could not be treated as liquidated. The accepted rule applicable to such claims is that where a debtor offers to settle and compromise the debt by sending to the creditor a check in the amount of such offer and compromise, it becomes the duty of the creditor either to accept the check or reject it, and he has no right to cash the check and thereby obtain the benefit of such offer without its accompanying burden of compromise. *Snow v. Griesheimer,* 220 Ill. 106; *Lapp v. Smith,* 183 Ill. 179; *Canton Union Coal Co. v. Parlin & Orendorff Co.,* 215 Ill. 244. This case goes one step further, however. Plaintiffs refused to accept the check in full settlement of the account, but protested

the same, and after stating that they would apply the check against defendants' account and take further action for the recovery of the balance, they nevertheless held the check continuously until the trial of the cause. Plaintiffs insist that the mere retention of the check under these circumstances is not as a matter of law an acceptance of defendants' offer, and, therefore, does not constitute an accord and satisfaction.

Where there is substantially no dispute as to the facts upon which the claim of accord and satisfaction is based, as in the instant proceeding, the great weight of authority in this county, including Illinois, holds that the question of the creditor's assent is one of law to be determined by the court. Williston on Contracts, Vol. 3, sec. 1854, and cases cited therein; *Lapp v. Smith,* 183 Ill. 179; *Bingham v. Browning,* 197 Ill. 122.

We find no reported cases where the circumstances were precisely the same as in this proceeding. However, from the reasoning employed in the reported cases on the doctrine of accord and satisfaction, we find that where a sum of money is tendered in satisfaction of a disputed or unliquidated claim, the party to whom it is offered is bound to understand therefrom that if he takes it subject to such condition, an acceptance of the money offered constitutes an accord and satisfaction, in the absence of fraud, imposition or mistake. The acceptance is an assent *de facto,* and the creditor is bound by it. If the creditor accepts the check and deposits it to apply on the debtor's account, it will be held to be an accord and satisfaction notwithstanding the creditor's protest or his statement that he expects to proceed against the debtor for the balance. *Ostrander v. Scott, supra.* The position of the creditor in such a situation should be definite and unequivocal. If the proposed settlement and the payment of the account tendered is not satisfactory to him, it is the creditor's duty immediately to repudiate the

offer and return the check. To hold the check indefinitely, after notifying defendants that they would cash it, is not consistent with a repudiation of the offer of compromise, for as stated in *Day-Luellwitz Lumber Co. v. Serrell,* 177 Ill. App. 30, a check or draft is not intended for indefinite circulation or hoarding. It is supposed to be negotiated promptly or presented promptly, and "if he is not willing to take the lesser sum in full, he must return the check without using it. This seems to be the law of Illinois as declared by the Supreme Court." Because we believe the doctrine of accord and satisfaction, as expressed in the various citations herein, is in its broadest sense applicable to the instant proceeding, we hold that the trial court properly determined the question of accord and satisfaction as a matter of law in favor of defendants, and the judgment of the court will, therefore, be affirmed.

*Affirmed.*

HEBEL, P. J., and WILSON, J., concur.